10 N.Y.3d 445 (2008)
889 N.E.2d 453
859 N.Y.S.2d 576
In the Matter of STEEL LOS III/GOYA FOODS, INC., Respondent,
v.
BOARD OF ASSESSORS OF COUNTY OF NASSAU et al., Appellants.
BETHPAGE UNION FREE SCHOOL DISTRICT, Intervenor-Respondent.
BETHPAGE UNION FREE SCHOOL DISTRICT et al., Respondents,
v.
NASSAU COUNTY et al., Appellants, and
GOYA FOODS, INC., Respondent.
In the Matter of PALL CORP., Petitioner,
v.
BOARD OF ASSESSORS OF COUNTY OF NASSAU et al., Appellants.
PORT WASHINGTON UNION FREE SCHOOL DISTRICT, Intervenor-Respondent.
Court of Appeals of the State of New York.
Argued March 11, 2008.
Decided April 24, 2008.
*447 Lorna B. Goodman, County Attorney, Mineola (Dennis J. Saffran of counsel), for appellants in the first above-entitled matter.
Jaspan Schlesinger Hoffman LLP, Garden City (Stanley A. Camhi of counsel), for Bethpage Union Free School District, intervenor-respondent and Bethpage Union Free School District and others, respondents in the first above-entitled matter.
*448 Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP, Mineola (John V. Terrana of counsel), for Steel Los III/Goya Foods, Inc., respondent in the first above-entitled matter.
Lorna B. Goodman, County Attorney, Mineola (Dennis J. Saffran of counsel), for appellants in the second above-entitled matter.
Lamb & Barnosky, LLP, Melville (Robert H. Cohen and Lilia Factor of counsel), for intervenor-respondent in the second above-entitled matter.
Chief Judge KAYE and Judges CIPARICK, GRAFFEO, READ, SMITH and PIGOTT concur.

*449 OPINION OF THE COURT
JONES, J.
These virtually identical appeals present the issue whether Nassau County Administrative Code (NCAC) § 6-26.0 (b) (3) (c) applies to so-called "payments-in-lieu-of-taxes" (PILOT payments), thus making deficits incurred by affected taxing jurisdictions resulting from property overassessments "a county charge." We hold that it does.
In the late 1990s, the Nassau County Industrial Development Agency (IDA)[1] acquired a 16-acre parcel of property from a fledgling company. With the aid of IDA-issued bonds and other incentives, Steel Los III/Goya Foods, Inc. (Goya) purchased the parcel. Simultaneously, Goya reconveyed the property to the IDA in exchange for a leasehold intereston which it constructed a *450 food processing facility.[2] Because the IDA's ownership rendered the property tax-exempt under article 18-A of the General Municipal Law (see § 874 [1])and in consideration for financing assistancethe IDA and Goya entered into a corollary PILOT payment agreement,[3] the annual amount of which to be determined by the County's assessments of the property.[4] Under the PILOT agreement, Goya had the express right to commence a tax certiorari proceeding to challenge the County's assessments pursuant to article 7 of the Real Property Tax Law. If successful (i.e., the assessments were reduced), the agreement provided that Goya would receive a refund in the form of a credit against future PILOT payments.
Beginning in 1999, Goya commenced several tax certiorari proceedings, later consolidated, challenging the County's assessments. Pursuant to a so-ordered judgment reflecting the parties' stipulated settlement, in 2003 Supreme Court directed the County to credit Goya approximately $700,000 in PILOT overpayments between 1999 and 2002, to be applied to future PILOT payment cycles to "affected taxing jurisdictions."[5] Of this amount, $454,628.20 represented proportional overpayments to the Bethpage Union Free School District. Meanwhile, after presentation ofand vote uponthe School District's budget for the 2004/2005 school year, and with the expectation that it would receive Goya's full PILOT payment, the School District received notice that its share of Goya's PILOT payments ($504,154.19) would be reduced by Goya's credit.
*451 The School District subsequently intervened in the tax certiorari proceeding and successfully obtained relief declaring that NCAC § 6-26.0 (b) (3) (c) applied to PILOT payments (i.e., that any refund to which Goya was entitled was solely "a county charge" that could not be used to offset PILOT payments due the School District). Supreme Court so modified and otherwise confirmed the prior judgment. The Appellate Division affirmed (see Matter of Steel Los III/Goya Foods, Inc. v Board of Assessors of County of Nassau, 35 AD3d 482 [2d Dept 2006]).
In 1993, the same IDA took title to property owned by nonparty Pall Corp. in exchange for a return leasehold interest and approximately $90 million in financing assistance. As with Goya, the IDA's ownership rendered the property tax-exempt. Accordingly, the parties entered into a virtually identical PILOT agreement. After commencing a series of tax certiorari proceedings spanning the 1990 through 2000 tax years, these parties similarly entered a stipulated settlement, reduced to judgment in 2002, entitling Pall Corp. to a credit of approximately $680,136.40 in overassessed PILOT payments proportionate to the Port Washington Union Free School District. As in Goya Foods, the School District learned of the judgment entitling Pall Corp. to the credit months after it approved its budget for the 2002/2003 school year. Thus, the School District faced a deficit of $430,656.42 in the 2002/2003 tax year, the balance to be credited in the next payment cycle.
After procedural history not relevant to this appeal, Supreme Court granted the School District's motion to intervene, but denied that part of the motion seeking to permanently enjoin enforcement of the settlement, concluding that NCAC § 6-26.0 (b) (3) (c) did not apply to the subject PILOT payments. On appeal, the School District relied on Goya Foods (35 AD3d 482 [2006]), in light of which the County did not oppose the appeal. The Appellate Division reversed Supreme Court's order, in relevant part, and granted the motion to enjoin enforcement of the tax certiorari order to the extent of directing the County to remit to the School District over $680,000, representing the total credit granted Pall Corp. The court held that because the NCAC's "no charge-back" provision "requires [the] County to absorb the cost of any tax refund or credit" awarded in a tax certiorari proceeding, the PILOT agreement "improperly burdened [the School District] with a shortfall in its school budget" (Matter of Pall Corp. v Board of Assessors of County of Nassau, 41 AD3d 722, 723, 724 [2d Dept 2007]). This Court granted leave to appeal and we now affirm in each case.
*452 These appeals hinge on the application of NCAC § 6-26.0 (b) (3) (c), which makes deficits "by reason of . . . reductions of assessments. . . a county charge." This unique "no charge-back" provision has relevance and application only in Nassau County (see L 1948, ch 851, § 2).
In both appeals the County argues that NCAC § 6-26.0 (b) (3) (c) does not apply to PILOT payments because such monies are contractual, "rather than tax payments" and, consequently, a law governing tax revenue should not apply. The school districts, on the other hand, contend that the PILOT payments under these unique circumstances are subject to the "no charge-back" provision requiring that the County absorb, rather than shift, "the financial burden of its assessment errors" to them. Although the County is technically correct that the payments are contractual and not taxes, per se, that is not a relevant distinction under the circumstances and we hold, as the school districts contend, that the purpose of the NCAC and the financial arrangement struck between the County and the companies involvedall unquestionably for the benefit of the school districts, among otherscompels the conclusion that the deficits in these cases are "a county charge."
The County's contention that the NCAC's "no charge-back" provision does not apply because it only concerns taxes is misplaced. Section 6-26.0 (b) (3) (c) specifically provides that if
"[i]n the case of a reassessment and relevy of an erroneous assessment, tax or assessment for benefit, the amount of tax or assessment for benefit finally due is less than the amount of tax or assessment for benefit as shown on the roll . . . before such tax or assessment for benefit was found to be erroneous, then . . . any deficiency existing, or hereafter arising from a decrease in an assessment or tax . . . or by reason of exemption or reductions of assessments shall be a county charge" (emphasis added).
Plainly, the "no charge-back" provision is triggered in the case of erroneous assessments (id.; see also NCAC § 6-17.2; RPTL 704 [1]). Indeed, the parties' PILOT agreements recognize this. In each, Goya and Pall Corp. had the express right to commence a proceeding to challenge the County's assessments on their properties. Independently, article 7 confers upon "aggrieved" persons standing "to review an assessment of real property" (RPTL 704 [1]; 700 [1] [emphasis added]). A person is "aggrieved" when an assessment has "a direct adverse affect on *453 the challenger's pecuniary interests" (Matter of Waldbaum, Inc. v Finance Adm'r of City of N.Y., 74 NY2d 128, 132 [1989]; see also Matter of Big "V" Supermarkets, Store #217 v Assessor of Town of E. Greenbush, 114 AD2d 726, 727 [3d Dept 1985]). Clearly, since an "assessment" includes "the valuation of exempt real property" regardless of whether the "property is subject to taxation" (RPTL 102 [2]), it is simply a misreading of NCAC § 6-26.0 (b) (3) (c) to argue that the full force of its "no charge-back" provision is inapplicable where exempt properties are involved, i.e., in this case, in the context of a PILOT agreement (see Matter of EFCO Prods. v Cullen, 161 AD2d 44, 46 [2d Dept 1990]). "[I]t is of no material consequence that aggrievement as the result of an assessed valuation originated in contract" (Big "V" Supermarkets, 114 AD2d at 728). PILOT payments, an obvious liability for Goya and Pall Corp., have an unquestionably direct adverse impact on their pecuniary interests (see Waldbaum, 74 NY2d at 132). While the issue of either Goya or Pall Corp.'s standing to commence article 7 review is not now, nor has it ever been, disputed, an article 7 review of "assessments" highlights both what is truly at play in the NCAC's "no charge-back" provision and its direct applicability here.
A deeper inquiry into the "no charge-back" provision amply supports this conclusion. The NCAC was amended in 1948 to align the consequences of assessment errors or illegality with a shift in the responsibility for rendering such assessments. Prior to 1938, town boards of assessors were responsible for preparing the assessment rolls for taxation purposes within their respective towns for all school, fire and other districts (see Assembly Mem in Support, Bill Jacket, L 1948, ch 851, at 7). Under this arrangement, each town or city was charged with deficits to any such districts resulting from illegal or erroneous assessments on the ground that such deficits "could be attributed to [their respective] assessors as shown in the certificates of error issued by them" (id. at 8). There was "no provision as to the manner in which the excesses or deficiencies . . . [were] handled. By custom, however, [they were] placed in [a so-called] `towns and cities' account and placed to the credit or debit of the respective towns and districts" (NY Dept of Audit and Control Letter in Support, Bill Jacket, L 1948, ch 98, at 6 [amending L 1936, ch 879, § 607]).
By 1938, however, the offices of town and city assessors were abolished and their powers transferred to the County Board of *454 Assessors. The sensible view"in the best interests of the County" and the affected taxing jurisdictionsthat any surplus or deficiencies arising from county assessments shall be credited or charged to it accompanied this shift in responsibility (see Nassau County Attorney Letter in Support, id. at 9). Thus, local districts were to be held harmless from the County's own assessment mistakes, and a concomitant amendment to section 6-17.3 of the NCAC eliminated the need for districts to be notified of proceedings challenging assessmentsprecisely because they would not be made to suffer the loss of their expectancy interests by surrendering tax revenue in the form of refunds to properties they had no role in assessing (see Assembly Mem in Support, Bill Jacket, L 1948, ch 851, at 9-10).
In these cases, the payments made by Goya Foods and Pall Corp. are admittedly contractual (i.e., "payments-in-lieu-of-taxes"). As the school districts highlight, however, the essence of the PILOT payment agreements, and the rights and obligations of the County, the PILOT payers and the school districtsexpress third-party beneficiaries under each agreement and, indeed, by statute (see General Municipal Law § 858 [15]; § 874 [3], [4] [a]; [5], [6]; see also Matter of Hudson Falls Cent. School Dist. v Saratoga County Indus. Dev. Agency, 217 AD2d 330, 332 [3d Dept 1995], affd for reasons stated below 88 NY2d 1026 [1996])compels us to conclude that the County is responsible for its erroneous assessments, even if the monies it is responsible for arise out of contract. The key is in the assessment.
In the typical assessment tax revenue situation in Nassau County, the "no charge-back" provision would apply in cases of erroneous assessments, and the County would be responsible for refunding the private company any overpaid taxes. As already noted, despite having received a sum certain in proportional tax revenue, local districts would not be required to refund any such monies, either positively or through credit (see NCAC § 6-26.0 [b] [3] [c]).
Under this scheme it would be anomalous indeed to treat deficits resulting from erroneous or illegal assessment-based PILOT payments differently. The legislative histories of both the NCAC and article 18-A of the General Municipal Law compel this conclusion. To reiterate, section 6-26.0 (b) (3) (c) expressly made such errors in assessments a county charge when the role of assessing properties was transferred from the local cities and towns to an efficient, centralized county unit. In accordance with this arrangement, school districts were rendered unnecessary *455 parties to assessment review proceedings (see NCAC § 6-17.3; see also Assembly Mem in Support, Bill Jacket, L 1948, ch 851, at 9-10; Matter of Long Is. Light. Co. v Assessor of Town of Huntington, 251 AD2d 331 [2d Dept 1998]).
Moreover, it is plain from a review of article 18-A that the Legislature was concerned about the potential detriment that IDA involvement would have whenever they enter the mix (see Senate Mem in Support, Bill Jacket, L 1993, ch 356, at 23 ["enacting a list of reforms designed to increase IDAs accountability to sponsoring municipalities and the public"]). Admittedly, article 18-A authorizes, but does not require, IDAs to enter into PILOT agreements. Ostensibly, however, "the essential (although not exclusive) purpose for [PILOT payments] is to reimburse affected taxing authorities for revenue lost by virtue of" IDA involvement (Hudson Falls Cent. School Dist., 217 AD2d at 332; see also General Municipal Law § 854 [16]). The local politics of IDA involvement and affected tax jurisdictions may be such that PILOT payments are virtually guaranteed. In any event, when such agreements do exist they must state "the amount due annually to each affected tax jurisdiction" or a formula for its calculation (General Municipal Law § 858 [15]). Further,
"[u]nless otherwise agreed by the affected tax jurisdictions, any such [PILOT] agreement shall provide that payments in lieu of taxes shall be allocated among affected tax jurisdictions in proportion to the amount of real property tax and other taxes which would have been received by each affected tax jurisdiction had the project not been tax exempt due to the status of the agency involved in the project. A copy of any such agreement shall be delivered to each affected tax jurisdiction within [15] days of signing the agreement" (id.).[6]
More fundamentally, it is apparent from the scheme of article 18-A that the Legislature deemed it wise to involve local districts to some meaningful extent to ensure that the impact of project developments would be measured. Therefore, the IDA must give *456 each affected tax jurisdiction notice of any proposed project (see § 859-a [3]). Additionally, section 874 requires IDAs to establish uniform tax exemption policies "with input from affected tax jurisdictions," and promulgate guidelines, "which shall be applicable to the provision of financial assistance" to the private entities (§ 874 [4] [a]). This input includes the
"types of projects for which exemptions can be claimed; procedures for [PILOT payments] . . . [;] the extent to which a project will create or retain permanent, private sector jobs; . . . whether affected tax jurisdictions shall be reimbursed by the project occupant if a project does not fulfill the purposes for which an exemption was provided; . . . the demonstrated public support for the proposed project; . . . the extent to which the proposed project will require the provision of additional services, including, but not limited to additional educational, transportation, police, emergency medical or fire services; and the extent to which the proposed project will provide additional sources of revenue for municipalities and school districts" (id.).
In short, we conclude that the NCAC's "no charge-back" provision applies to the subject PILOT payments.
Accordingly, in each case the Appellate Division order should be affirmed, with costs.
In each case: Order affirmed, with costs.
NOTES
[1] Creatures of state law, IDAs are public benefit corporations with broad powers to issue attractive financing, including tax-exempt bonds, in order to promote local economic development (see General Municipal Law § 858 et seq.; see also L 1969, ch 1030).
[2] Goya received bonds in the principal amount of $9.5 million "to finance a portion of the costs of the acquisition, construction and equipping" of the facility.
[3] General Municipal Law § 854 (17) defines PILOT payments as "any payment made to an agency, or affected tax jurisdiction equal to the amount, or a portion of, real property taxes, or other taxes, which would have been levied by or on behalf of an affected tax jurisdiction if the project was not tax exempt by reason of agency involvement."
[4] The PILOT agreement provided, among other things, that

"[a]s long as the [IDA] shall have title to, or any interest in, the Facility, [Goya] agrees to make payments in lieu of all real estate taxes and assessments . . . that would be levied upon or with respect to the Facility if the Facility were owned by [Goya] and not by the [IDA]." (See General Municipal Law § 854 [17]; § 858 [15].)
[5] General Municipal Law § 854 (16) defines "affected tax jurisdiction" as "any municipality or school district, in which a project is located, which will fail to receive real property tax payments, or other tax payments which would otherwise be due, except for the tax exempt status of an agency involved in a project."
[6] See also General Municipal Law § 874 (5) (imposing upon "project occupant[s]" or IDAs financial penalties for late PILOT remittances to affected taxing jurisdictions); § 874 (6) (right to commence action against project occupant or "any person, firm, corporation, organization or agency which is obligated to make payments in lieu of taxes under an agreement and has failed to do so").