# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 16

In the Matter of Larchmont
Pancake House,
    Appellant,
  v.
Board of Assessors &c., et al.,
    Respondents.
(And Three Other Proceedings.)

Kevin M. Clyne, for appellant.
William Maker, Jr., for respondents.
Stop & Shop Supermarket Company, LLC; International Council of Shopping Centers;
New York State School Boards Association; New York State Conference of Mayors and
Municipal Officials et al., amici curiae.

GARCIA, J.:

The Real Property Tax Law sets out a tiered scheme for the review of property tax

assessments. Initially, a complainant who is dissatisfied with a property assessment may

seek administrative review by filing a grievance complaint with the assessor or the board

- 1 -

of assessment review (see RPTL 524).  The requirements for initiating administrative review of a tax assessment are set forth in RPTL article 5 (see RPTL 524 ["Complaints with respect to assessment"]).  RPTL section 524 provides that "a complaint with respect to an assessment . . . must be made by the person whose property is assessed, or by some person authorized in writing by the complainant or his officer or agent to make such a statement who has knowledge of the facts stated therein" (RPTL 524 [3]).

Once a grievance complaint has been properly filed and the board of assessment review has made a determination, any "aggrieved party" may seek judicial review of the assessment pursuant to RPTL article 7 (see Matter of Waldbaum, Inc. v Finance Adm'r of City of N.Y., 74 NY2d 128, 132 [1999]; RPTL 704 ["Commencement of proceeding"]).  In order to maintain an article 7 tax certiorari proceeding, the aggrieved party must allege in its petition that "a complaint was made in due time to the proper officers to correct such assessment" (RPTL 706 [2]).  In other words, the proper filing of an administrative grievance pursuant to RPTL article 5 is a condition precedent to judicial review pursuant to RPTL article 7.

The dispute in this case concerns the pool of appropriate challengers at each stage of assessment review.  In particular, the parties dispute (1) whether petitioner is qualified, as a non-owner, to seek administrative review pursuant to RPTL 524 (3), and (2) whether petitioner is an "aggrieved party" with standing to maintain a tax certiorari proceeding pursuant RPTL article 7.

I.

This appeal arises out of four tax certiorari proceedings challenging annual tax assessments on real property located in the Town of Mamaroneck. Petitioner, the Larchmont Pancake House, is a family-owned corporation that operates an International House of Pancakes franchise on that property. The corporation was formed by Frank and Susan Carfora. The Carforas owned the real property together until Frank's death, when Susan became the sole owner. Upon Susan's death in October 2009, the property was transferred to a revocable trust (the Carfora Trust) pursuant to the terms of Susan's will.

Nearly four years later, in June 2013, the real property was transferred to Susan's daughters, Irene Corbin and Portia DeGast, pursuant to the terms of the Carfora Trust. In the interim, petitioner continued to operate the restaurant on the property and to pay all of the operating costs, including the real estate taxes.

In the tax years 2010, 2011, 2012, and 2013, petitioner timely filed administrative grievance complaints, challenging the real property assessments for each of those years. Each complaint attached an authorization signed by Portia DeGast in her capacity as the president or owner of the Larchmont Pancake House. The board of assessment review confirmed the tax assessments, and petitioner thereafter commenced tax certiorari proceedings – a separate one for each year – pursuant to RPTL article 7. Respondents (the Board of Assessors, the Assessor of the Town of Mamaroneck, and the Board of Assessment Review) moved to dismiss the petitions, arguing that (1) Supreme Court lacked subject matter jurisdiction because petitioner was not the owner of the real property and

therefore had not satisfied RPTL 524 (3)'s requirements for commencing the administrative proceeding, and (2) petitioner lacked standing to challenge the tax assessments because petitioner was not an aggrieved party, as required by RPTL 704 (1).

Supreme Court denied respondents' motion to dismiss the petition in each proceeding. The Court first rejected respondents' argument that petitioner failed to comply with a "precondition of the assessment challenge" provided by RPTL 524. Even though the petition was "not signed by the owner of the property," the Court declined to "hang the decision on that simplistic peg," noting that Portia DeGast "was one of the beneficiaries of a Trust which owned the property." The Court also rejected respondents' standing argument, holding that "Portia DeGast was an aggrieved party with the necessary standing" to institute the judicial proceeding.

The Appellate Division unanimously reversed and granted respondents' motions to dismiss (153 AD3d 521 [2d Dept 2017]). The Court agreed that petitioner had standing as an "aggrieved party" for purposes of RPTL article 7 – reasoning that the tax assessments had a "direct adverse affect" on petitioner's pecuniary interests – but determined that Supreme Court nonetheless "lacked subject matter jurisdiction to review the assessments" (id. at 522). The Court noted that "the filing of a grievance complaint" is a "condition precedent and jurisdictional prerequisite to obtaining judicial review" and, pursuant to RPTL article 5, the "property owner" must "file the complaint or grievance to obtain administrative review of a tax assessment" (id.). In this case, petitioner "never owned the subject property" and, consequently, the Court determined that petitioner was not

authorized to file the grievance complaint (id.). Accordingly, the Court held that petitioner "failed to satisfy a condition precedent to the filing of the petitions" and therefore Supreme Court "should have granted [respondents'] motion[] to dismiss the petition in each proceeding" (id.).

This Court subsequently granted petitioner's motion for leave to appeal (31 NY3d 907 [2018]). We now hold that petitioner is not an aggrieved party within the meaning of RPTL article 7 and, accordingly, that petitioner lacks standing to maintain this proceeding. We affirm on that ground.

II.

A taxpayer is aggrieved under article 7 where the tax assessment has a "direct adverse affect on the challenger's pecuniary interest" (Matter of Waldbaum, Inc. v Finance Adm'r of City of N.Y., 74 NY2d 128, 132 [1999]; see also Matter of Steel Los III/Goya Foods, Inc. v Board of Assessors of County of Nassau, 10 NY3d 445, 452-453 [2008]; Matter of Walter, 75 NY 354, 357 [1878]). The quintessential aggrieved party under RPTL article 7 is a taxpaying owner of real property (see Garth v Board of Assessment Review for Town of Richmond, 13 NY3d 176, 178 [2009]; Matter of Gantz, 85 NY 536, 538 [1881]; Walter, 75 NY at 357). Naturally, when an assessment is laid, it is "[t]he owner of the land" whose property is "rendered much less the valuable to him" and "worth so much the less in the market" (Walter, 75 NY at 357). Besides the property owner, the lessee of an undivided assessment unit may be aggrieved by a tax assessment "if legally bound by the lease to pay the entire assessment on behalf of the owner at the time it is laid"

(Waldbaum, 74 NY2d at 133; see also Matter of Burke, 62 NY 224, 227-228 [1875]). Much like an owner, a lessee who is "bound by his lease to pay an assessment" is "likely to be put to litigation and expense" as a direct result of its legal obligation (Burke, 62 NY at 227-228).

In Matter of Waldbaum, the Court considered whether a partial commercial lessee may be an "aggrieved party" if responsible, under the terms of its lease, to pay a pro rata share of the property taxes (Matter of Waldbaum, Inc. v Finance Adm'r of City of N.Y., 74 NY2d 128, 132 [1999]). There, the petitioner entered into a 20-year lease with a shopping center. The shopping center paid the property taxes, but the petitioner's lease required it to pay a formulated share, such that a tax increase would cause an increase in the petitioner's annual rent costs (id.). The petitioner later instituted successive tax certiorari proceedings challenging several real property tax assessments levied against the shopping center.

Adhering to established aggrievement principles, the Court in Waldbaum determined that "[a] fractional lessee lacks standing to maintain a tax certiorari proceeding unless the lease expressly confers the right to assert the lessor's undivided property interest in a challenge of the assessment, or unless the lessee is required to pay directly the taxes levied against the lessor's undivided parcel" (Waldbaum, 74 NY2d at 132). The petitioner in Waldbaum was not, "by contractual rearrangement of the obligation," made wholly responsible for the tax liability; legal responsibility for the assessment instead remained with the shopping center (id. at 131, 133, 134). Even though, as a practical matter, the

property assessment had an adverse financial impact on the petitioner, it had, "in the legal sense," only a "remote and consequential impact" on the petitioner's pecuniary interest – "not the required direct adverse affect necessary to confer standing" (id. at 131).

Here, the parties agree that, during the relevant years, petitioner was not the owner of the subject property, nor was petitioner legally bound to pay the real property taxes. Petitioner contends, however, that the tax assessments had a direct impact on its pecuniary interest sufficient to render it "aggrieved" within the meaning of RPTL article 7:   Unlike the petitioner in Waldbaum, petitioner here is the sole occupant of the property – not a partial lessee – and, during the relevant years, petitioner paid the entirety of the real property taxes directly to the taxing authority – not merely a pro rata share.  But the critical fact remains the same:  Like the petitioner in Waldbaum, petitioner here was not "legally responsible" for paying the undivided tax liability (Waldbaum, 74 NY2d at 134).

A contractual obligation to assume the undivided tax liability ensures the requisite direct pecuniary impact, irrespective of whether the taxpayer is a fractional lessee (Matter of Big "V" Supermarkets v Assessor of Town of E. Greenbush, 114 AD2d 726, 727 [3d Dept 1985]) or a nonfractional lessee (Matter of Malik v Tax Commission of the City of New York, 68 AD3d 870, 871 [2d Dept 2009]).  Of course, like any taxpaying tenant, petitioner is not immune from the impact of an increased tax obligation.  That burden may be sizeable, particularly in the case of a longstanding occupant.  But like any tenant – long-term or not – petitioner could have ceased paying the property taxes at any time without incurring any direct legal consequence vis-à-vis the taxing authority or the property owner.

Instead, it was the property owner – the Carfora Trust – that risked loss of the property if the taxes were not paid (Walter, 75 NY at 357; see also Burke, 62 NY at 227-228). In other words, only a lessee who is "obligated to pay" an assessment is sure to "lose something from his own property or means" (Walter, 75 NY at 357). For those reasons, while "paying taxes always has a direct adverse effect on one's pecuniary interest" (dissenting op at 10), that alone has never been enough (see Waldbaum, 74 NY2d at 131). Accordingly, in the absence of a direct contractual obligation, the assessment's remote and consequential impact on petitioner is inadequate to confer standing.[1]

A direct legal obligation also promotes the goals of clarity, efficiency, and judicial economy embodied in the RPTL. As we have noted before, article 7's standing requirement serves a number of salutary purposes: avoiding a fracturing of challenges against an assessment; preventing duplicative petitions; and protecting the taxing authority from multiple litigations as to the same parcel by parties of unknown relation to the taxed premises (Waldbaum, 74 NY2d at 134). To those ends, article 7's aggrievement provision consolidates the authority to seek judicial review of a challenged assessment, generally requiring non-owners to assume a direct obligation to pay the owner's taxes, or to obtain a

---

[1] The informal, de facto "arrangement" described in the affidavits of Portia DeGast and the trustee – whereby petitioner paid the operating costs while occupying the property rent-free – does not amount to a contractual obligation, regardless of whether it involved members of a "happy family" (dissenting op at 23), or generated "smiles of . . . satisfied customers" (dissenting op at 7). Nor does petitioner contend that the arrangement imposed any sort of legal obligation with regard to payment of the real property taxes (contra dissenting op at 16 [reasoning that petitioner's arrangement constituted a "classic bargained-for exchange"]).

contractual authorization to pursue a tax certiorari proceeding. By narrowing the field of appropriate challengers, this bright line rule avoids needless confusion and thereby minimizes the risk of fractured and duplicative assessment challenges. Here, petitioner lacks any legal obligation to assume the undivided tax liability or authorization to pursue this proceeding and, as such, lacks standing under article 7.

Nor is Portia DeGast an aggrieved party based on her status as a beneficiary of the Carfora Trust. The parties agree that, during the relevant years, the trust itself – not Ms. DeGast – owned the subject property. Like petitioner, Ms. DeGast was not authorized to pursue an article 7 proceeding on the property owner's behalf. And, like petitioner, Ms. DeGast lacked any legal obligation to pay the real property taxes; to the contrary, the terms of the Carfora Trust explicitly authorized beneficiaries to "enjoy the assets held by the trust <u>without rent or other compensation</u> to the trust, such as by occupying the trust's real property" (emphasis added). In any event, the petitioner in this matter is the Larchmont Pancake House – not Ms. DeGast.[2]

### III.

Petitioner is a non-owner with no legal authorization or obligation to pay the real property taxes and, as such, petitioner is not an aggrieved party within the meaning of RPTL article 7. Because petitioner lacks standing, we have no occasion to consider the

---

[2] This case is also not about a "clerical" error or "technicality" (dissenting op at 2, 22). Petitioner does not contend that Ms. DeGast intended to sign (or had the capacity to sign) the authorization on behalf the Carfora Trust.

parties' dispute concerning the scope of appropriate challengers under RPTL 524.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Matter of Larchmont Pancake House v Board of Assessors,
Assessor of the Town of Mamaroneck, and the Board of Assessment Review

No. 16

WILSON, J. (dissenting):

Real Property Tax Law § 704(1) provides, in relevant part, that "any person claiming to be aggrieved by any assessment of real property upon any assessment roll" may seek judicial review of that assessment. The majority holds that a person who,

- 1 -

pursuant to a longstanding arrangement, pays 100% of the property taxes on a piece of land, cannot "claim[] to be aggrieved" even by the improper inflation of the property taxes they pay.

That conclusion is as wrong as it sounds. Worse still, the mistake relied on to divest these aggrieved taxpayers of their right to judicial review is purely clerical: hardworking pancake proprietors, following their mother's death, listed the name of their business instead of the name of the trust that temporarily held legal (but not equitable) title to the land on which their business sat. The trust filed an affidavit saying it would have approved of the tax proceedings when they were filed, and executed authorizations of the proceedings once the problem was brought to its attention. To top it off, the Town knew all along who owned the property and did not see fit to mention it until four years had passed. All agree the claimed error was harmless, yet the Court dismisses the proceedings anyway.

For almost a century, we have followed the rule that courts should disregard errors like this, so that taxpayers can vindicate their rights to an accurate and equitable property tax assessment (NY Const, art XVI, § 2; NY Const, art I § 11). "The Tax Law," we have explained, "relating to review of assessments is remedial in character and should be liberally construed to the end that the taxpayer's right to have [its] assessment reviewed should not be defeated by a technicality" (People ex rel. New York City Omnibus Corp. v Miller, 282 NY 5, 9 [1939]). Putting the wrong name on a tax assessment challenge is the kind of "technicality" the courts should disregard if no one is prejudiced (People ex rel.

Durham Realty Corp. v Cantor, 234 NY 507, 508 [1922]) and the party in whose name the proceeding should have been brought consents. If our own precedent were not enough reason to permit this error to be corrected and the challenge to proceed as filed, the Legislature has repeatedly directed the courts to ignore defects in petitions, complaints, and pleadings "if a substantial right of a party is not prejudiced" (CPLR 2001, CPLR 3026). These provisions embody "an enlightened system of civil procedure and eschews the elevation of form over substance" (Vincent Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 2001). The late Professor David Siegel, "a preeminent expert in New York civil practice" (Rodriguez v City of New York, 31 NY3d 312, 318 n 3 [2018]) described one of these statutes, CPLR 3026, as "the philosopher, the oracle, to which all disputants turn for advice . . . [declaring that] if the defect prejudices no one, it must be ignored" (David D. Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3026:1).

The majority abandons our rule of lenity and renders CPLR 3026 a Cassandra. Relying on hypertechnicalities to close the courthouse doors to aggrieved taxpayers undermines the Constitutional mandate that tax assessments be neither inaccurate nor inequitable (Burrows v Board of Assessors for Town of Chatham, 64 NY2d 33, 36 [1984]), replacing the Legislature's liberal scheme for challenging local government decisions with a new, gloomier rule: you can't fight City Hall.

## I

The family-owned International House of Pancakes franchise at 1375 Boston Post Road is a Larchmont institution. In 1985, Frank and Susan Carfora purchased the parcel of land there and opened their restaurant, incorporated as Larchmont Pancake House, Inc. ("LPH"). Two of Mr. and Ms. Carfora's daughters—Portia DeGast and Irene Corbin—became co-owners of LPH with their parents in 1995, and from that date Ms. DeGast served as LPH's president (for ease of reference, I will call the entire family "the Carforas").

Shortly after Ms. DeGast assumed her leadership role at LPH, her parents took steps to ensure the business stayed in the family after their passing. Mr. Carfora provided in his will that his stock in the business and ownership of the Boston Post Road property would go to his wife upon his death. After Mr. Carfora died, Ms. Carfora sought to transfer her stock in LPH as well as ownership of the land to her daughters. Exactly how Ms. Carfora accomplished the transfer of the land, however, needs some explanation. Rather than simply deeding the Boston Post Road property to her children directly while she was alive, or willing it to them directly upon her death, Ms. Carfora willed the property to a trust ("the Carfora Trust"), with Kimberly Corbin (Ms. Carfora's granddaughter) and Kevin O'Donnell (Ms. Carfora's lawyer) as Trustees and executors of her estate. The Carfora Trust was a temporary stopping-point for the land. When Ms. Carfora died, her will transferred the land to the Trust; the Trust's declaration in turn instructed the trustees to transfer the land to Ms. Corbin and Ms. DeGast as tenants in common upon Ms. Carfora's death.

Unfortunately, the land stayed in the Carfora Trust waystation for several years as the probate process dragged out, as probate proceedings sometimes do.[1] Ms. Carfora's will was first admitted to probate in Surrogate's Court in New Jersey in 2009; an ancillary probate petition in New York (to effectuate the transfer of the Boston Post Road land) was not commenced until 2012, and the property was finally transferred to Ms. Corbin and Ms. DeGast in June 2013. The Carfora Trust declaration made express provision for what was to be done with the land while it was in the care of the Trust, giving the trustees the power to "permit the beneficiary of any trust [i.e., Ms. Carfora's children] to enjoy the assets held by the trust without rent or other compensation to the trust, such as by occupying the trust's real property" but otherwise insisting that property the Trust owned be "leased," if it was to be occupied by non-beneficiaries, such as LPH.

While all of this was going on, the Carforas had to attend to the other inevitability of life: taxes. Ms. Carfora died in 2009, right at the height of the housing crisis. Property prices throughout the State declined precipitously, and many small business owners understandably sought to have their businesses' property values re-assessed to reduce their tax burden, a burden made acute by the general economic downturn.[2] The Carforas,

---

[1] See generally Charles Dickens, Bleak House (1853) (in which the central "scarecrow of a suit" around which the plot revolved was, at bottom, a will probate proceeding).

[2] The Westchester County Clerk records that tax certiorari filings from commercial landowners like the parties in this case jumped from 3,398 in 2008 to 4,268 in 2011, attributing the increase to the economic downturn (Westchester County Clerk, Finally! A Decline in Tax Certiorari Cases [March 9, 2013], https://www.westchesterclerk.com/news/2013-news/304-finally-a-decline-in-tax-certiorari-cases).

attempting to keep their business afloat amid personal tragedy and the worst recession since the Depression, joined thousands of other Westchester families in seeking property tax relief by challenging their tax assessment.

Challenging a commercial property tax assessment is a two-step process. First, one must file an administrative complaint with the Town's Board of Assessment Review (RPTL 706[2], see Matter of Onteora Club v Board of Assessors of the Town of Hunter, 17 AD2d 1008, 1009 [3d Dept 1962], aff'd, 13 NY2d 1170 [1964]). That filing is done on a form provided by the State, and requires, among other things, a statement authorizing the complaint "made by the person whose property is assessed, or by some person authorized in writing by the complainant or his officer or agent to make such statement who has knowledge of the facts stated therein" (RPTL 524[3]). Second, "any person claiming to be aggrieved" by the property tax assessment and dissatisfied with the result of the town's administrative review may file a tax certiorari petition to have the property tax assessment reviewed by a court (RPTL 704).

The quintessential "aggrieved" person is, as the majority explains, "the taxpaying owner of real property" (majority op at 5). Here, however, the taxpayer and the owner were different people. The property taxes owed on the Boston Post Road parcel were paid by LPH, the family business, and not by the Carforas or the Carfora Trust (the "owners," in varying combinations at various times, of the land). LPH paid the taxes as part of a longstanding and simple arrangement: LPH, wholly owned and operated by the Carforas, would "reside" on the Boston Post Road property rent-free, and in return would pay all the

utilities, repairs, and property taxes it, or the land, incurred. The arrangement made sense: it was LPH that directly benefited from the use of the land. The Carforas' enjoyment of the land came indirectly, from the profits realized by LPH and, doubtless, from the smiles of LPH's satisfied customers.[3] However, as with many family-run small businesses, the arrangement was not embodied in a formal contract; the Carforas simply paid out of the LPH account the property taxes and others expenses of maintaining the property used by the restaurant. Certainly, there is no evidence in the record to suggest that the Town ever rejected LPH's tax payments on the grounds that the wrong person was paying the taxes.

Having paid the Boston Post Road property taxes via LPH, the Carforas filed property tax valuation challenges in the name of LPH that are the subject of this appeal: one for the each of the 2010 to 2013 tax years. Each filing was accompanied by an authorization from Ms. DeGast that read as follows:

> I, the undersigned, being an aggrieved person within the meaning of the Real Property Tax Law, or an officer or partner of such aggrieved person, as complainant, hereby designate and authorize the below named law firm [Herman, Katz, Cangemi & Klyne, LLP] or any other attorney designated by said firm, to act as my representative in any and all proceedings before the Board of Assessment Review."

In 2010, and again in 2011, then 2012, then 2013, the Town Board of Assessment Review ("the Town") reviewed the complaints and, each year, rejected the challenges to

---

[3] Appellate jurists may particularly enjoy their egg, bacon, sausage, French toast, and pancake combo, entitled "the Split Decision."

the assessments. Each and every year the Town did so, it never queried LPH's right to challenge the assessments, even though (as events would demonstrate) the Town's own records indicated that LPH had never been the owner of the property. After each administrative denial, LPH filed a tax certiorari petition pursuant to RPTL 704. Even then, the Town never questioned LPH's right to bring either the administrative complaint or the tax certiorari petition until four years after these proceedings started, when suddenly the Town sought to throw out all four certiorari actions on two grounds. First, the Town argued that the administrative complaints were defective because such complaints could only be brought by an "person whose property is assessed" (RPTL 524). The Town read this language to mean that only "owners" could bring such challenges, and between 2009 and 2013, it argued, the "owners" of the Boston Post Road property were the trustees of the Carfora Trust and not the trust beneficiaries (Ms. DeGast or Ms. Corbin). Second, the Town argued that even if LPH could make the administrative complaint pursuant to an authorization from the owner, LPH was not an "aggrieved" party able to bring a tax certiorari proceeding; there too, it argued, only the Carfora Trust had standing to sue (absent a written agreement between the Trust and LPH assigning property taxes to LPH).

Supreme Court denied the Town's motion to dismiss the petitions, finding that LPH, as the payer of the taxes, was sufficiently "aggrieved" under RPTL 704 and Ms. DeGast, who authorized the complaints, was a "person whose property is assessed" by virtue of her status as a beneficiary of the Carfora Trust and president of LPH. Supreme Court also observed that "the fact that the Town waited so many years after the filing for the

municipality to complain of this technicality seems a bit disingenuous." The Appellate Division agreed with Supreme Court that LPH was a "person claiming to be aggrieved" and could file the tax certiorari proceeding because "the assessments had a direct adverse effect on its pecuniary interests" (153 AD3d 521, 522 [2017]). However, the Appellate Division held that because LPH "never owned the subject property," (id) it could not have commenced the administrative proceedings in the first place, and therefore Supreme Court lacked jurisdiction over the tax certiorari petitions.

## II

I have three principal points of disagreement with the majority's rationale for affirmance. First, our decision in Matter of Waldbaum, Inc. v Finance Admr. of City of N.Y. (74 NY2d 128, 132 [1999]) does not require that a taxpayer be "legally bound to pay" property taxes to be "aggrieved" such that they can challenge that assessment (majority op at 5-7). Second, even if Waldbaum did hold that "aggrieved" means "legally bound to pay," there is sufficient—and uncontroverted—record evidence here to raise a question of fact as to whether LPH was legally bound to pay the property taxes. Third, the entity the majority concludes was legally bound to pay the taxes—the Carfora Trust—consented to the tax certiorari petitions and thus the use of LPH's name on the petition should be disregarded (or a right to amend to make a technical correction should be allowed) under our precedents, CPLR 2001, and CPLR 3026.

**A**

The majority and I agree that a party can "claim to be aggrieved" under RPTL 704 only if the tax assessment has a "direct adverse effect on the challenger's pecuniary interest" (Waldbaum, 74 NY2d at 132).[4] That is precisely what has occurred here: because LPH actually paid the entirety of the taxes owed on the Boston Post Road land, the assessment (which determined the amount paid) had a "direct adverse effect on the challenger's pecuniary interest" in the same way that paying taxes always has a direct adverse effect on one's pecuniary interest. If you don't believe me, you have never paid taxes.

Contrast the petitioner in Waldbaum, which we held could not "claim[] to be aggrieved" under RPTL 704. Waldbaum, a grocery store lessee, never paid the property taxes on the subject property; the property taxes were always paid by the owner of the shopping mall in which the Waldbaum's grocery store was located. Instead, Waldbaum's lease specified that its rental payments to the landlord might fluctuate depending on a complex formula that took into account changes to the landlord's property tax obligations in such a way that Waldbaum paid "additional rent" only if property tax increases that year were a certain proportion larger than the amount of rent Waldbaum would pay as a function of its gross annual sales (Waldbaum, 74 NY2d at 134-35).

---

[4] Waldbaum refers to an "adverse affect," but the Court plainly meant "adverse effect"— although a taxpayer's affect may be affected (or even effected) by an overlarge tax bill.

In addition, Waldbaum was just one of several tenants occupying a single tax parcel. Because a property tax assessment challenge reviews the assessed value of the entire parcel, and not the value of smaller pieces of the parcel that happen to be occupied by individual tenants, it was fundamentally unfair for one lessee to steer the course of a litigation that would affect the property taxes for all lessees, not to mention the property's owner (id at 134). Under those circumstances, we explained, "[i]t seems necessary to us as a matter of sound policy and interpretation to condition a partial lessee's procedural standing in such matters on a direct obligation to pay the lessor's taxes or on a contractual authorization to pursue a tax certiorari proceeding, representing the undivided assessment unit, in the lessor's stead in order to avoid a fracturing of challenges against an assessment" (id.).

However, the majority misreads Waldbaum to impose the requirement that one must be "legally responsible" for paying the property taxes owed in order to be "aggrieved" by an assessment. Waldbaum did require that "*partial lessee's* procedural standing in such matters" be conditioned on "a direct obligation to pay the lessor's taxes" (id [emphasis added]), but that obligation arose as an alternative sufficient condition for aggrievement. That is, even a fractional lessee, such as Waldbaum, would be sufficiently aggrieved if it had a direct obligation to pay the entire tax bill of the landlord rather than just its own portion of that tax bill. That is why the Waldbaum Court cited Matter of Burke (62 NY 224 [1875]), which the majority in this case misleadingly claims stands for the proposition that only threatened pecuniary losses that the "direct result of its legal obligation" (majority op

at 6) constitute "aggrievement." Instead, <u>Burke</u> supported the conclusion in <u>Waldbaum</u> that tax proceedings should be open to more than owners, because, as the <u>Burke</u> Court explained, the tax certiorari proceeding "was meant to afford an early, speedy and cheap mode of testing the legality. It is open to any one, owner or lessee, who is likely to be put to litigation and expense by reason of it" (<u>id</u>. at 228).

Contrary to the majority's contention (majority op at 6-7), <u>Waldbaum</u> is silent on the question of whether a person who actually pays the entirety of the taxes on a tax lot—which Waldbaum did not do—can "claim to be aggrieved" under RPTL 704. However, in <u>Matter of Walter</u> (75 NY 354 [1878]) a case <u>Waldbaum</u> cited in support of its analysis, we explained that although a lessee who paid the entirety of property taxes "loses nothing in the diminished value of the land in market, by reason of the lien put upon it" if he does not pay, "he will lose something from his own property or means, if he must pay" (<u>Walter</u>, 75 NY at 357). That conclusion precisely describes LPH's situation. <u>Waldbaum</u>, which never considered the aggrievement of an actual payor of all property taxes on the challenged assessment, does not.

The majority's aggrievement rule does not merely ignore our prior cases; it ignores reality. Suppose a couple of my colleagues and I order coffees. I gratuitously pay for all, and later realize the barista has overcharged me. Surely I am aggrieved by the overcharge, even though I had no legal obligation to pay for my colleagues' coffee. The same rule should apply here: a person who pays the entirety of someone else's property tax is as, if

not more, aggrieved as the lucky beneficiary of that payment, even if at the time the taxes were paid the payor had no "legal obligation" to do so.

Indeed, under the majority's rule, it might be that no one could bring a tax certiorari petition under the circumstances present here. Because the challenged assessments were uniformly paid by LPH, neither Ms. DeGast nor the Trust (and certainly not the Trustees) experienced a "loss of something from [her or its] own property or means" because of the challenged assessment. Although failure to pay the property taxes would have resulted in enforcement action by means of a lien, the trustees are personally immune under Lien Law § 77 and the possibility of harm to the trust or to Ms. DeGast because of a chain of causation that begins with nonpayment might be deemed "remote and consequential" (Walter, 75 NY at 357), and thus insufficient, under Waldbaum and the majority's opinion today. Whatever the purposes of the RPTL, it surely cannot be said that it intended taxpayers like the Carforas to find themselves mired in a judicial Catch-22.

Indeed, the majority's rule does not even advance the purposes it claims are embedded in the RPTL: "clarity, efficiency, and judicial economy" (majority op at 8). Determining who paid the challenged taxes is a simple task. Determining who had a "legal obligation" to pay them may not be. Even here, as I explain below, there is a triable issue as to whether the arrangement between the trust and LPH is a sufficient legal obligation to render LPH aggrieved. Many other, more difficult scenarios await.

Consider, for example, an instance in which the Carfora Trust did not have sufficient cash on hand to pay the taxes. If the trustees—mindful of their need to avoid breaching

their fiduciary duties by defaulting on their tax obligations—pay the property taxes out of

pocket, is their fiduciary duty a sufficient legal obligation to render them aggrieved? Or

consider land divided between life estates and partial fee owners with various vested and

unvested contingent remainders: who is "legally obligated" to pay taxes then? What if the

validity of the life estate is disputed? What if the division of ownership interests in fact

violates the Rule Against Perpetuities (EPTL 9.1.1[b]) but no one has noticed it yet?[5] I

repeat the warning Judge Fuchsberg gave more than thirty years ago: resort to

---

[5] The majority, in a citation-free paragraph of pure dicta, dismisses the possibility that Ms. DeGast might be an aggrieved party based on her status as a beneficiary of the Trust because "the parties agree that the trust itself—not Ms. DeGast—owned the subject property" when these petitions were filed (majority op at 9). The parties agreed (as do I) that the Carfora Trust possessed *legal* title, but that is beside the point. It is an elemental principle of trust law that when real property is put in trust, the ownership interest is divided—the trustees hold legal title and the beneficiary holds equitable title (EPL 7-2.1). The question is whether the equitable/beneficial title Ms. DeGast held in the subject land as a trust beneficiary carried with it sufficient ownership interest in the subject parcel such that one would be "aggrieved" by the taxes levied upon it. It does. Because beneficiaries still hold substantial incidents of title, their interest in the property is superior, in many ways, to that of the trust or the trustees (Restatement [Second] of Trusts § 88, Restatement [Third] of Trusts § 42). New York Jurisprudence goes so far as to declare that "an executor or fiduciary is not the 'owner' of realty" (87 NY Jur 2d, Property § 11; accord People ex rel. Brownell v Board of Assessors of City of Buffalo, 109 NYS 991 [Sup 1908], affd, 127 AD 851 [4th Dep't 1908], revd on other grounds, 193 NY 248 [1908] [trustee whose trust held legal title to residence could not sign petition for street improvement because statute required signatures of "resident owners"]). Here, the Trust Declaration gave Ms. DeGast and Ms. Corbin one of the major branches in the classic bundle of rights making up property rights in land—use and enjoyment of the land rent-free—while keeping only legal title in the hands of the trustees. To say then that *only* the Trust would be harmed by a failure to pay property taxes is to ignore the express terms of the Trust Declaration and the beneficiaries' equitable ownership interests. At the end of the day, the ultimate losers of the Carfora Trust's hypothetical default on its tax obligations would have been its beneficiaries—which means that Ms. DeGast, as a beneficiary, is as good, if not a better, a candidate for "aggrieved" party than the Trust itself.

"hypertechnical punitive processes . . . impacts unfavorably on the desirable goal of judicial economy. Such adventures should not receive our encouragement, surely not in the absence of a more telling context" (A & J Concrete Corp. v Arker, 54 NY2d 870, 873 [1981] [Fuchsberg, J., concurring]). Recognizing that someone who pays a tax bill is aggrieved is simpler to administer, fairer and more consistent with our precedents than the rule the majority announces today.

**B**

Even under the majority's rule that LPH must have a "legal obligation to pay" the entirety of the property tax assessment to be sufficiently aggrieved, LPH should still win. On summary judgment—the posture of this case—there is sufficient evidence of the existence of an agreement to create a triable issue of fact. Uncontroverted record evidence supports the existence of an agreement that obligated LPH to pay property taxes and other costs of maintaining the real property in exchange for use of the premises.

The affidavit of Kimberly Corbin, a trustee of the Carfora Trust, explains that "Prior to Susan Carfora's death, the Larchmont Pancake House operated out of the subject property on a rent-free basis and paid all of the operating costs for the property including utilities, repairs, and property taxes. Following Susan Carfora's death, the estate and her trust continued that arrangement with Irene Corbin and Portia DeGast, who were owners of the Larchmont Pancake House." Ms. DeGast filed an affidavit to the same effect.

According to the declaration of trust and the will of Susan Carfora, the Carfora Trustees are without power to permit anyone other than Irene Corbin and Portia DeGast—

including LPH—to use the subject property rent free. Indeed, the trustees had a fiduciary duty to the beneficiaries to obtain income from the property if possible. The affidavits explain (albeit perhaps subject to challenge at trial) how LPH complied with the declaration and met its fiduciary duty: it charged LPH "rent" for the land by allowing it to reside on the land in exchange for the payment of taxes and all other incidents and costs of the land. That is a classic bargained-for exchange (Restatement [Second] of Contracts § 17)—use of land in exchange for payment of the costs incurring from such use—that served to assign legal responsibility to pay real property taxes to LPH.

The majority rejects this "informal, de facto arrangement" in a footnote bereft of analysis, declaring it "does not amount to a contractual obligation" (majority op at 8 n 1).[6] The majority does not say why for a simple reason: it cannot. The RPTL contains no requirement that an agreement requiring a tenant to pay taxes be in writing, nor does Waldbaum or any of our decisions so hold. Even if the Town were to attempt to raise the Statute of Frauds as a basis to disallow proof of the oral contract (which it has never asserted), because each of LPH and the Carfora Trust (the contractees) "admit[ted] in its pleading, testimony, or otherwise in court that a contract was made" (General Obligation

---

[6] The majority notes that the Caforas did not use the phrase "legal obligation" to describe the "arrangement" by which LPH paid property taxes and other expenses (majority op at 8 n 1), but the Carforas also did not use the terms "de facto" or "informal" the majority uses to characterize the arrangement's legal status. The uncontested testimony as to the existence of the arrangement and its apparently flawless performance over many years creates a triable issue of fact as to the legal effect of the arrangement sufficient to defeat summary judgment.

Law § 5-701[3][c]) by filing sworn affidavits below, the contract is excepted from the Statute of Frauds.

Furthermore, year after year, LPH fully performed its obligations under the "informal, de facto" agreement, creating a course of performance from which a contractual obligation could be established. In Canda v Totten (157 NY 281 [1898]) we confronted exactly this situation: a third party paid property taxes on behalf of owner but without a written agreement, and the question before us was whether that arrangement was legally enforceable. We held it was; even in absence of a writing "as required by the provisions of the Statute of Frauds, there was performance of the agreement on the part of the plaintiff, and acceptance thereof by the defendant, and this fact operated to take the case out of the statute [of frauds]" (id. at 287). Likewise, in Matter of Burke (62 NY at 227), we relied on an affidavit that averred that the leaseholder had a legal obligation to pay the property tax assessment at issue, rather than insisting on the production of a written lease.[7]

---

[7] Indeed, even if the LPH's payment of the property taxes was a gratuitous payment (as the majority seems to imply), and even if the Statute of Frauds applied, a gratuitous promise to pay a sum on behalf of another causing a detrimental reliance can give rise to a "legal obligation to pay" as a matter of promissory estoppel—indeed, we so held just last year (In re Estate of Hennel, 29 NY3d 487 [2017]). The affidavits explain in no uncertain terms that the Carfora Trust relied on those payments to preserve its unencumbered legal title to the land so that it could execute the trust declaration's command that legal title in the land be transferred to Ms. DeGast and Ms. Corbin. Had LPH failed to pay the taxes, the Carfora Trust could well have sued LPH for the harms it would incur as a consequence (accepting the majority's assumption that we ought to assign no significance to LPH's principal officers and stockholders being the same persons as the Carfora Trust's beneficiaries). Thus LPH had a "legal obligation to pay" the taxes arising out of the Carfora Trust's detrimental reliance on its preexisting agreement to pay it under settled promissory estoppel principles.

Even were there some doubt as to the binding nature of LPH's contract with the Carfora Trust, there is ample record evidence of the agreement to satisfy LPH's burden at the summary judgment stage. On summary judgment, "facts must be viewed in the light most favorable to the non-moving party" (Vega v Restagno Constr. Corp., 18 NY3d 499, 503 [2012], quoting Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]), and "summary judgment should not be granted where there is any doubt as to the existence of a factual issue or where the existence of a factual issue is arguable" (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 315 [2004], citing Glick, 22 NY2d at 441]). Only two years ago, we held that when two home renovators disputed the exact nature of the "arrangements" they entered into in the course of various construction projects, triable issues of fact on the existence and nature of the "arrangement" precluded summary judgment (Utica Mut. Ins. Co. v Style Mgt. Assoc. Corp., 28 NY3d 1018, 1020 [2016]). The majority makes no mention of the summary judgment posture of the case or our holding in Utica. On these facts, however, LPH easily surmounts the summary judgment threshold even under the majority's new "legal obligation" test.[8]

---

[8] Because I would hold that LPH's proceeding should not be dismissed and reject the majority's aggrievement holding, I must explain why the administrative complaints issued here were valid. The majority has no need to, and does not, address that question, so I summarize my views briefly. RPTL 524(3) does not require that an administrative complaint be *filed* by "the person whose property is assessed." Indeed, RPTL 524(3) states that the complaint may be filed either "by the person whose property is assessed, or by some person authorized in writing by the complainant or his officer or agent to make such statement." I would hold that LPH could file the complaints as a person authorized to do so by the "owner:" the beneficial owner, Ms. DeGast. It is not necessary for me to reach the larger question presented by the parties and *amici*—whether "person whose property is

# C

Even if the petitioner in a tax certiorari proceeding must have a legal obligation to pay the taxes to be "aggrieved," and even if LPH had no legal obligation to pay taxes (that is, accepting the majority's proposition that the Carfora Trust was the only party able to bring this action), LPH should still prevail under our well-established technical error doctrines.

CPLR 2001 provides that "at any stage of an action including the filing of a . . . petition to commence an action . . . if a substantial right of a party is not prejudiced, the mistake, omission, defect or irregularity shall be disregarded." Here, proceeding on the assumption above, the only mistake was submitting the action in the name of LPH rather than the majority's identified "aggrieved party:" the Carfora Trust.

Only three people could possibly be prejudiced by the correction of that technical error: the Carfora Trust, its beneficiaries, or the Town. The Carfora Trust would not be prejudiced by correction of the error. Its Trustee, Kimberly Corbin, affirmed that "had I been asked to authorize a grievance and/or petition to review the subject property's assessment for the 2010, 2011, 2012, or 2013 tax year, I would have agreed to do so." She then did so retrospectively, on behalf of the Trust, authorizing the proceedings for those years in the course of this litigation.[9] The beneficiaries also would not be prejudiced. Ms.

_____

assessed" means *only* an "owner"—because even if it did, an "owner" approved the complaint here.

[9] The majority never addresses this authorization by the Carfora Trustee; even if one accepted that Ms. DeGast did not intend to sign on behalf of the Carfora Trust or in her

DeGast approved of the proceeding—she signed the authorizations that started the matter. Finally, the Town has never suggested, including in its briefing to this Court, that it suffered a whit of prejudice because the wrong party was named. It knew the identity of the lot and the basis of the claim of overassessment, and evaluated and rejected the claims on the merits.[10]

The Court offers no explanation for disregarding CPLR 2001 (majority op at 9 n 2) and ignores our settled precedents by doing so. In People ex rel. Schwarz v Miller (281 NY 554 [1939]) we held that the owner's failure to sign the administrative complaint verification would be forgiven notwithstanding the mandatory nature of the verification. Discussing that case in People ex rel. New York City Omnibus Corp. v Miller (282 NY 5 [1939]) we held that errors in administrative proceedings should be treated (and forgiven) in the same fashion as errors in a tax certiorari proceeding. We disregarded an error nearly identical to the one present here in People ex rel. Durham Realty Corp. v Cantor (234 NY 507 [1922]). There, the property under consideration was owned by one James B. Duke. The petition should have been verified by Mr. Duke, but by mistake it was verified by Durham Realty Corp—a mistake discovered three years later. We reversed the Appellate Division's dismissal of the case and adopted the opinion of the dissenting Justice, who

---

capacity as its beneficiary (majority op at 9 n 2), the Trustee *did* sign—it simply did so only after the lawsuit was commenced, once the "error" had been identified.

[10] CPLR 2001 applies to tax proceedings (Great E. Mall, Inc. v Condon, 36 NY2d 544, 548 [1975]) and applies to the commencement of proceedings, including mistakes in the name under which a proceeding was filed (Ruffin v Lion Corp. (15 NY3d 578, 581 [2010]).

stated that "under the liberal provisions of the statutes of this state in regard to practice, the amendment should have been allowed" (201 AD 834, 835). Finally, and perhaps most relevant here, in <u>Miller v Board of Assessors</u> (91 NY2d 82 [1997]), we held, citing CPLR 2001, that petitioner's "error in naming the prior owner of the Robinson property in the petition was a technical defect that was corrected when a written authorization from Robinson was filed" (<u>id</u> at 87; <u>accord</u> <u>People ex rel. Floersheimer v Purdy</u>, 221 NY 481, 483 [1917] ["Under such circumstances it would be unjust to hold that because the corporation was unauthorized to act in the first instance, or the attorney was unauthorized to procure the issuance of the writ, the relator should be punished by denying him any relief whatever"]; <u>Tagliaferri v Weiler</u>, 1 NY3d 605, 606 [2004] [wrong name in notice of appeal should be disregarded because all understood who was actually taking the appeal]).

Moreover, in light of the Trust's authorization of the LPH lawsuits, the error is technical and not jurisdictional under our "two-pronged test . . . consonant with modern rational thinking toward pleading and procedure" that looked simply to whether (1) the proper party received notice, and (2) whether that party would be prejudiced by disregarding the defect (<u>Great E. Mall, Inc. v Condon</u>, 36 NY2d 544, 548 [1975]). The Carfora Trust had proper notice and approved this proceeding brought to defend the interests the majority holds it, and only it, has. No one can explain how anyone in the subject proceeding was prejudiced even trivially by this error. Certainly the Town cannot; the Trust cannot; the Carforas cannot; even the majority cannot. I am at a loss to explain

its silent deviation from our long line of cases establishing lenity for this type of technical defect in tax proceedings.

### III

The majority's retreat from our "civil harmless error" doctrine is my gravest concern. In 1875, we described the tax certiorari proceeding as "open to any one, owner or lessee, who is likely to be put to litigation and expense by reason of it" (Burke, 62 NY at 228). In the decades since then, we have repeated our command that "the Tax Law relating to review of assessments is remedial in character and should be liberally construed to the end that the taxpayer's right to have his assessment reviewed should not be defeated by a technicality. No substantial rights of the town were prejudiced by the granting of the amendment" (People ex rel. New York City Omnibus Corp. v Miller, 282 NY 5, 9 [1939]; accord W. T. Grant Co. v Srogi, 52 NY2d 496, 513 [1981]; Matter of Great Eastern Mall v Condon, 36 NY2d 544 [1975]). Exactly ten years ago, we reaffirmed that "mere technical irregularities in the commencement process should be disregarded if a substantial right of a party is not prejudiced. . . . [to] require strict compliance with [the statute] in this context would mean that, under certain circumstances, petitioners would be foreclosed from judicial review of their tax assessments through no fault of their own. We find that approach unduly harsh and contrary to our historically liberal construction of pleading and procedure in tax certiorari proceedings" (Garth v Bd. of Assessment Review for Town of Richmond, 13 NY3d 176, 181 [2009]). The majority refuses even to cite to these enduring legal principles.

Lenity is especially appropriate because this case involves the presence of a type of party we rarely see in our Court: a happy family. Happy families are alike in a way particularly germane to the application of lenity here. The members of happy families often do not execute formal written agreements with each other, though they clearly understand and perform the bargained-for agreements between and among them. Our decisional law has consistently emphasized the importance of lenity as applied to taxpayers, and our state's constitution prohibits the overassessment of real property (NY Const, art XVI, § 2). It is unfortunate that we bar these taxpayers from seeking judicial review because the beneficial owner, instead of the trustee, signed the authorization, or because the family business that actually paid the taxes, instead of the trust, was listed as "owner" on a form. That is particularly so when the taxing authority fully considered the administrative challenges to the assessment, ruled on them, was not prejudiced by any of the defects it now alleges, and belatedly raised them.

I respectfully dissent.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Order affirmed, with costs.  Opinion by Judge Garcia.  Chief Judge DiFiore and Judges Stein, Fahey and Feinman concur.  Judge Wilson dissents in an opinion in which Judge Rivera concurs.

Decided April 2, 2019